**UNITED STATES of America,
Plaintiff,**

v.

**William Jay BINDER, Defendant.**

**Case No. 13–20556.**

United States District Court,
E.D. Michigan,
Southern Division.

Signed June 5, 2014.

F. William Soisson, U.S. Attorney's Office, Detroit, MI, for Plaintiff.

***OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND DISMISSING INDICTMENT***

DAVID M. LAWSON, District Judge.

Defendant William Jay Binder is charged in a single-count indictment with unlawfully distributing Schedule II and III controlled substances. The government's theory is that Binder, while he was a licensed physician, dispensed and prescribed narcotic pain killers "outside the course of professional medical practice and for no legitimate medical purpose." Indictment at 1–2. Neither side called a physician at trial to testify whether Binder's professional conduct extended beyond the bounds of legitimacy. The government called two pharmacists as witnesses, but they could not say that the prescriptions Binder wrote were for no legitimate medical purpose. The Sixth Circuit has held that although expert testimony from a doctor is not always required to prove an unlawful prescription-writing case, in some instances "evidence as to the usual practice might be essential to the proof of the government's case." *United States v. Word,* 806 F.2d 658, 663 (6th Cir.1986). This is such a case. Therefore, the Court finds the proofs insufficient and will grant the defendant's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(b) and dismiss the indictment.

I.

Trial was held on March 18 through 24, 2014. After two days of deliberation, the jury was unable to reach a unanimous decision, and the Court declared a mistrial on March 25, 2014. The defendant made an oral motion for judgment of acquittal mid trial, which the Court took under advisement. After the mistrial, the Court established a briefing schedule, and held oral argument on May 12, 2014.

At trial, the government offered documentary evidence that included the medical files of 31 patients treated by Dr. Binder at his clinic located in Ypsilanti, Michigan. Four of those patients testified. Each of the four patients said that

they had pain when Dr. Binder examined them, and each also testified that they had suffered serious injuries that had caused them pain.

One patient, Kathleen Baier, testified that she had serious ongoing pain from a crushed ankle, knee problems, cysts, a heel spur, and various surgeries, and without the medication prescribed by Dr. Binder she would not have been able to work. Trial Tr. vol. II, 15–18, 23–24, Mar. 19, 2014. She stated that she was in "severe pain" at the time of her testimony at trial. *Id.* at 26. She testified that during the time she was treated by Dr. Binder, she discussed with him her need for pain medication that she could afford due to restrictions on her medical coverage, and she admitted that if she had not been taking pain medication she would not have been able to work. *Id.* at 31–32.

Christopher Balagna testified that he had ongoing pain from the age of 16 due to a fall from a ladder during construction work, which caused him to have a double hernia, as well as from a motorcycle accident that happened when he was 27. Trial Tr. vol. II, 67–69, Mar. 19, 2014.

Sandra Strong testified that at the time of trial she had been prescribed and was taking medication for back pain resulting from injuries she suffered in a car accident. Trial Tr. vol. II, 161–62, Mar. 19, 2014. She testified that her pain was real and she was not "faking it," *id.* at 162, and she rated her pain as a "two" when she was on medication, but estimated that without medication prescribed by the defendant it would have been "eight," *id.* at 167–68.

Stuart Stein testified that he went to Dr. Binder to receive medication because he had "lower back pain, scoliosis, and arthritis through[out] my body from [over 20] broken bones." Trial Tr. vol. III, 18, Mar. 20, 2014. Stein brought medical charts

from other doctors documenting his injuries and his past treatment for pain when he first saw Dr. Binder. *Ibid.*

Each of the patients also stated that they paid an ordinary fee for each office visit with Dr. Binder. Stuart Stein paid a $20 or $30 co-payment for each office visit, because he was covered by Medicare Part D. Trial Tr. vol. III, 8, Mar. 20, 2014. Kathleen Baier paid at first $80 and later $120 for each office visit. Trial Tr. vol. I, 9–10, Mar. 18, 2014. Christopher Balagna paid at first $75 and later $125 for each office visit. Trial Tr. vol. II, 55, Mar. 19, 2014. Susan Strong paid at first $120 or $125 and later $50 for each office visit. *Id.* at 154–55.

The patient files established that Dr. Binder regularly prescribed Schedule II and II controlled substances in various dosages and combinations for the patients at nearly each office visit. Some of those patients, Stuart Stein in particular, complained of an addiction to or dependency on the narcotic pain killers. And the evidence showed that some of the patients were guilty of "doctor shopping," that is, seeing other physicians seeking to obtain more prescriptions for the narcotic medications.

But none of the patients testified that they paid money to buy prescriptions from the defendant for the drugs named in the indictment. Kathleen Baier testified that she never paid the defendant for a prescription. Trial Tr. vol. II, 34, Mar. 19, 2014. Stuart Stein also specifically testified that he never paid the defendant for a prescription. Trial Tr. vol. III, 18, Mar. 20, 2014.

Pharmacist William Drake testified about his review of the medical charts from eighteen of Dr. Binder's patients, but he did not meet with or interview any of the patients whose charts he reviewed.

Trial Tr. vol. II, 137, Mar. 19, 2014. Dr. Drake's trial testimony was limited to discussing the "reasons why a physician might prescribe certain elements of the pharmacopeia, so that [the pharmacist] can exercise his discretion in doing his job," *id.* at 111, and Dr. Drake admitted that he was not qualified to diagnose illness or prescribe medicine, *id.* at 137–38. Dr. Drake agreed that "controlled substance medications have a place in non-cancer chronic pain treatment." *Id.* at 119. And he said that a pharmacist would consider many factors when deciding whether to fill a prescription or not, including the "volume, the amount, the strength, the duration, the purpose," and "many other things." *Id.* at 116. Dr. Drake conceded that there were "no hard and fast rules" that dictate if a particular prescription is issued for a legitimate purpose, *id.* at 120, and that determination would depend on the particular circumstances of each patient's treatment, *id.* at 149. Dr. Drake admitted that one of the considerations would be the patient's tolerance level, which would be higher for patients who previously had taken opioid medications than for those who had not. *Id.* at 146. When asked what he would do if someone presented a prescription for methadone, oxycodone, and valium, Dr. Drake testified that he "would have to investigate that information very closely and very much in detail," and that he would speak to the patient and the physician. *Id.* at 108–09. When asked what he would do if presented with a prescription for the same three drugs and marinol, Dr. Drake stated he would feel "uncomfortable" and "probably would not fill those." *Id.* at 109–10.

Pharmacist Catherine Poll testified about certain "red flags" that she observed during her review of Dr. Binder's patient files and "SRS" data. Trial Tr. vol. III, 51, Mar. 20, 2014. ("SRS" is the prescription-tracking software used by pharmacies, including the Canalis pharmacy where most of the patients in this case filled their prescriptions, Trial Tr. vol. III, 78, Mar. 20, 2014.) Dr. Poll was not qualified to testify regarding "protocols" for the treatment, diagnosis, and prescription of drugs to treat pain, because she admitted that she was not trained or licensed to treat patients or to prescribe drugs. *Id.* at 50–51. Dr. Poll conceded that although dispensing several Schedule II controlled substances to a patient was a "red flag," there was no "absolute bar" against doing so and no state or federal law would prohibit such prescribing practices. *Id.* at 62–63. Dr. Poll conceded that whether a particular prescription was appropriate would depend on all the circumstances of the patient's case and his or her individual need for treatment. *Id.* at 63. Dr. Poll also admitted that the physician's determination of what drugs to prescribe, after consultation with the patient, carried substantial weight in a pharmacist's decision whether to fill a prescription or not. *Id.* at 62. Like Dr. Drake, Dr. Poll also conceded that the tolerance of a patient for opiate medications would be a factor in determining whether a particular dosage was appropriate. *Id.* at 58.

DEA Diversion Investigator Jacqueline Honoway's testimony at trial consisted largely of reciting certain portions of thirty-one patient files seized from Dr. Binder's clinic. Honoway admitted that the DEA seized between 175 and 200 patient files, and that an unknown number of other files were left at the clinic. Trial Tr. vol. IV, 45, Mar. 21, 2014. Honoway testified that she had the opportunity to review all of the files. *Id.* at 46. Although Honoway testified that the "SRS" data revealed that many patients filled multiple prescriptions from Dr. Binder at the same pharmacy, which was in the same building as his office, she conceded that it might be ap-

propriate for a physician to direct patients to fill all prescriptions at the same pharmacy, "in order to keep a clear record of prescribing history." *Id.* at 48. Honoway also admitted that using a pharmacy located in the same building as a doctor's office is not a "red flag." *Id.* at 49. Honoway testified that the DEA investigation could have included staged attempts by an undercover officer or a patient to purchase prescriptions from the defendant, but no such attempts were made. *Id.* at 49. And Honoway conceded that of the 31 patients whose files were presented, 11 were dismissed as patients by Dr. Binder based on the same "red flags" that Honoway identified in her review, including two of the patients who testified at trial—Kathleen Baier and Sandra Strong. *Id.* at 52–56.

## II.

■ When addressing a motion for judgment of acquittal under Rule 29(b), the Court must view the evidence in the light most favorable to the prosecution and determine whether there was sufficient evidence offered at trial to convince a rational trier of fact beyond a reasonable doubt that all of the elements of the charged crime had been established. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir.2010); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "The relevant question in assessing a challenge to the sufficiency of the evidence is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007); *see also Jackson*, 443 U.S. at 318, 99 S.Ct. 2781. The evidence need not exclude every theory of innocence. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. The testimony of a single witness is generally sufficient to demonstrate guilt beyond a reasonable doubt. "The prosecution, however, must present substantial evidence as to each element of the offense from which a jury could find the accused guilty beyond a reasonable doubt." *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir.1985) (internal citation omitted). "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *United States v. Martin*, 375 F.2d 956, 957 (6th Cir.1967). But where the evidence is at least as indicative of innocence as guilt, the Court must direct a verdict of acquittal. *United States v. Berger*, 224 F.3d 107, 116 (2d Cir.2000).

■ The single charge in this case is that Dr. Binder unlawfully distributed controlled substances. Licensed physicians are authorized to dispense and write prescriptions for narcotics that fall under Schedule II and III of the Controlled Substances Act. But "[a] violation of the Controlled Substances Act (CSA) occurs when a physician dispenses or distributes a controlled substance in a manner that is not authorized by law—i.e., the prescription is issued by a physician without 'a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.'" *United States v. Volkman*, 736 F.3d 1013, 1026 (6th Cir. 2013) (citing 21 U.S.C. § 841(a)(1); 21 C.F.R. § 1306.04(a); *United States v. Kirk*, 584 F.2d 773, 784 (6th Cir.1978)).

■ "In order to obtain a conviction under 21 U.S.C. § 841(a)(1) against a licensed physician ... the government must show: '(1) That defendant distributed a controlled substance; (2) That he acted intentionally or knowingly; and (3) That defendant prescribed the drug without a legitimate medical purpose and outside the

course of professional practice.'" *United States v. Johnson*, 71 F.3d 539, 542 (6th Cir.1995) (quoting *United States v. Varma*, 691 F.2d 460, 462 (10th Cir.1982)). In this case, the focus of the defendant's motion is on the third element.

■ "If a physician dispenses a drug in good faith in the course of medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of accepted medical practice." *Volkman*, 736 F.3d at 1021 (quotation marks omitted). "'Good faith' in this context means good intentions and an honest exercise of professional judgment as to a patient's medical needs. It means that the defendant acted in accordance with what he reasonably believed to be proper medical practice." *Ibid.*

■ No physician testified at trial that Dr. Binder's prescribing practices exceeded the bounds of legitimacy. It is true that expert testimony is not always required, particularly in cases where "'there is evidence of conduct clearly outside the usual course of any professional practice.'" *Word*, 806 F.2d at 663 (quoting *United States v. Smurthwaite*, 590 F.2d 889, 892 (10th Cir.1979)). However, such cases typically involve evidence of plainly improper prescribing practices that a lay juror could recognize as illegitimate, such as (1) prescriptions issued for use by one patient but in the name of another patient; (2) admissions by patients that drugs would be used for nonmedical purposes, or "to get high," or that patients had no medical need for drugs but merely "liked them" or were "out of them"; (3) falsification of patient records, or requiring patients to use false names and identifications when filling prescriptions; (4) gigantic numbers of prescriptions written in a short period of time (e.g., 5,000 prescriptions in four months); (5) dispensing prescriptions without taking any medical his-

tory, conducting any examination, and in some cases without even meeting patients; and (6) prescribing drugs in return for incidental services by patients unrelated to any medical treatment. *United States v. Varma*, 691 F.2d 460, 464 n. 2 (10th Cir. 1982) (collecting cases).

■ In cases lacking such indicia of the absence of a legitimate medical purpose that even a lay juror could recognize, a directed verdict of acquittal is proper if expert evidence is not presented, because the jury has no reasonable basis on which to conclude beyond a reasonable doubt that the defendant acted outside the course of professional practice. *United States v. Shultice*, No. 98–54, 2000 WL 34030842, at *5 (N.D.Iowa Apr. 4, 2000) (noting that "[t]his is not the type of case that can be decided without expert testimony" and "[e]xpert medical evidence is required for a jury to ascertain and appreciate what type of conduct is and what type of conduct is not within the usual course of medical practice, and what type of conduct is without any legitimate medical purpose"). In *Shultice*, the district court found that expert testimony was required even where some indicia of unusual prescribing practices was introduced, such as notes in patient files that patients told the doctor if he did not prescribe drugs, "they would get them on the street," and testimony by other patients that in some cases the doctor prescribed controlled substances for them on the same day they were released from the hospital after undergoing treatment for substance abuse. *Id.* at *6.

The government offered evidence in this case showing all the pharmacies Dr. Binder's patients used to fill the prescriptions issues by Dr. Binder. The data was collected by the Michigan Automated Prescription Service (MAPS), which is a data bank maintained by the State of Michigan

to which all pharmacies that dispense controlled substance prescriptions regularly report. Trial Tr. vol. II, 101, Apr. 1, 2014. But where the government presents only "pattern" or "red flag" evidence sifted from a large number of patient files, particularly where no expert determination was made as to the suitability of the treatment in each case, the evidence is insufficient, without more, to demonstrate guilt beyond a reasonable doubt. *United States v. Tran Trong Cuong,* 18 F.3d 1132, 1141 (4th Cir.1994); *see also United States v. Jones,* 570 F.2d 765, 769 (8th Cir.1978) (stating that evidence derived from summaries of large numbers of patient files directed merely in a general way to the quantity of prescriptions written and "quality" of patients treated "lack[s] substantial probative force upon the issue of improper medical practice").

The evidence presented by the government at trial was not sufficient to permit a rational juror to find that Dr. Binder prescribed drugs without a legitimate medical purpose and outside the course of professional practice. There was no evidence that patients admitted abusing drugs or stated a desire to receive medication other than for treatment of serious pain; sought or received prescriptions under fake identities; or received drugs intended for one person but prescribed for another. The government does not dispute that all of the patients who testified had a medical history of serious physical injuries that caused them real pain. Each of these patients testified that they felt pain and asked Dr. Binder to prescribe medication to relieve it.

Moreover, the government did not dispute the amounts of the routine office fees of between $20 and $125 that each of the testifying patients paid. There was no suggestion by any witness that those fees were excessive or amounted to actual pay-

ment for the prescriptions themselves, and two patients testified that they never paid for prescriptions. The government introduced no evidence to establish that Dr. Binder wrote an excessive number of prescriptions, and it made no showing at all as to the total amount of income that he derived from his practice. To the extent that the record suggests anything about the size of Dr. Binder's practice, the only evidence available from the government's investigator was that only around 200 files were seized during the investigation, with an unknown number of other files that were not seized or examined. Christopher Balagna's testimony could be construed as suggesting that he once paid Dr. Binder for a prescription for Marinol and a sample pack of another medication, but that evidence is insufficient to support the charge in the indictment because it related to a prescription written for a drug that was not named in the indictment and never was identified in evidence as a controlled substance. Moreover, the drug apparently was prescribed three years before the earliest date alleged in the indictment.

The government's own investigator conceded that directing patients to fill all prescriptions at the same pharmacy in a building adjoining the doctor's office not only was not a "red flag" in itself, but might even be prudent to facilitate a complete accounting of all drugs received by each patient. And the government offered no evidence that Dr. Binder conducted his practice in any unusual or casual settings, or anywhere other than in his medical office.

The government contends that Dr. Binder saw the patients infrequently, only once a month or every other month, and that he must have been selling prescriptions because that was the only service patients received. It is true that the patient-witnesses testified that they visited Dr. Bind-

er's clinic once a month or once every other month, saw the doctor, who conducted an examination, albeit a cursory one, and left with nothing in hand other than a new prescription. But if that were a sufficient showing of illegitimacy, then every physician that has ever administered ongoing drug therapy for any sort of chronic condition might be convicted for "selling prescriptions."

Moreover, the government's contention that Dr. Binder did nothing but issue rubber-stamp prescriptions is belied by the enormous volume of medical records introduced by the government itself, comprising more than 10,000 pages from 31 patient files. The government did not contend or even suggest at trial that any of those files were falsified or manufactured, and the testimony of the government's DEA investigator dwelled at considerable length on many details recorded in those files. In fact, the government was able to highlight the numerous "red flags" in the various patient files only because Dr. Binder had regular, in-person appointments with each of his patients during which he asked probing and repeated questions regarding their conduct, and thereafter recorded in detail the answers to his inquiries in his patient files. The undisputed documentary evidence that the government itself presented reveals that Dr. Binder made searching, persistent inquiries regarding his patients' use of controlled substances, which included examining records of their visits to other medical providers, conducting "pill counts," taking urine samples, and repeatedly inquiring as to the true magnitude of his patients' physical pain. And the government does not dispute that as a result of those inquiries Dr. Binder in fact stopped treating 11 of the 31 patients whose files were examined at trial, because he determined that they did not have any legitimate medical need to take controlled substances.

Some of the patients testified that Dr. Binder made no effort or not enough effort to provide alternatives to medication or to wean them from taking the controlled substances to which several of the patients asserted they were addicted. But criminal culpability cannot turn on whether Dr. Binder pursued the best or most prudent course of treatment. Instead, the proper inquiry must be whether, when he prescribed controlled substances for patients who told him they were suffering serious physical pain, Dr. Binder was acting without any legitimate medical purpose and outside the usual course of professional practice. The most that the government's expert pharmacists could say, after reviewing Dr. Binder's patient files, was that some of the prescriptions would have prompted investigation and inquiry or might have made them "uncomfortable," and that they "probably" would not have filled them. None of the government's experts testified that they categorically would have refused to fill a particular prescription, or that any particular combination of drugs and dosages prescribed could not have been given for any legitimate medical purpose. Those pharmacists were well qualified in their field, but they were not trained, licensed, or qualified to diagnose patients or prescribe medications. Without the testimony of a qualified expert to establish the range of legitimate medical purposes that might be pursued in treating the pain of these patients, and to show whether or not Dr. Binder's prescriptions fell within the usual course of professional practice in pursuing some legitimate medical purpose, the jury was left with no basis on which they reasonably could determine if Dr. Binder acted lawfully, in good faith, or unlawfully, without any legitimate medical purpose and outside the course of professional practice.

The evidence at trial was not adequate to allow the jury to find beyond a reasonable doubt that Dr. Binder " 'prescribed the drug[s] without a legitimate medical purpose and outside the course of professional practice.' " *Johnson*, 71 F.3d at 542 (quoting *Varma*, 691 F.2d at 462). Therefore, the Court will grant the defendant's motion for judgment of acquittal and dismiss the case.

### III.

The government did not present sufficient evidence at trial to establish beyond a reasonable doubt all the essential elements of the offense charged.

Accordingly, it is **ORDERED** that the defendant's motion for judgment of acquittal is **GRANTED.**

It is further **ORDERED** that the indictment is **DISMISSED WITH PREJUDICE,** the defendant is **DISCHARGED,** and bond is **CANCELLED.**

It is further **ORDERED** that the defendant's motion to adjourn the trial and pretrial conference [dkt. # 39] is **DISMISSED as moot.**